HENRY N. PHILLIPS et al., Appellants, v. MARY A. JACKSON et al.

**Division One, February 29, 1912.**

1. **MERGER OF TITLE.** Where a deed of trust to certain land has been made to B for the benefit of A, and a sheriff's deed to the same land is made to A's husband, acting as her agent, there is no merger of title. Merger of title is upheld in equity when it accords with the intention of the parties, but it is upheld neither in equity nor at law unless two titles, a greater and a less, have coalesced in the same person.

2. **CONDITIONAL SALE: Equitable Mortgage: Resolving Doubt.** Whether a given state of facts constitutes a conditional sale of land depends upon the intent of the parties and the extinguishment of all indebtedness. For, if any indebtedness survives the transaction, or if it is intended to secure a present loan, or to provide against future liability, then the transaction is *ipso facto* an equitable mortgage, however absolute may be the form of the conveyance. If there is a doubt as to whether a sale with a right of repurchase or an equitable mortgage was intended, equity will resolve the doubt in favor of a mortgage. What begins as a mortgage remains a mortgage; what begins as a conditional sale remains a conditional sale.

3. **EQUITABLE MORTGAGE: Buying at Execution Sale: Agreement to Allow Redemption.** The plaintiffs owned a section of land worth over thirteen thousand dollars, and A held their note for $6700, secured by a deed of trust on the land, by the terms of which the rents and profits were to be applied to pay interest, taxes and the principal of the debt. They owned also twenty-one town lots worth $2500. All this property was sold under execution on a judment for about $400, and A's husband, acting as A's agent, bought it *en masse* for $1000. The amount of the bid was fixed by agreement, and the property was purchased for that sum upon one bid. The surplus of this bid was applied upon other indebtedness of the plaintiffs' to a bank. No note for previous indebtedness of plaintiffs to A and her husband was or has been surrendered, and several witnesses testified that immediately after getting the sheriff's deed, A's husband stated that he could make only such repairs as were necessary to the cultivation of the land or to secure rent of the town lots, in order that the sum due him could be paid as soon as possible and the property deeded back to plaintiffs. The plaintiffs assert, and the evidence tends to show, that A's husband, as her agent, agreed with the plaintiffs before the execution sale that he would give them two years to

redeem the land (that much he admitted), and that the rents and profits should go as in the deed of trust mentioned above. *Held*, that A's husband became trustee of the town lots under an equitable mortgage, and the later deeds from him to A and from the two to their children left these grantees subject to the same trusts that existed against him. The deed of trust upon the farm lands must be enforced according to its terms. So far as it is concerned the sheriff's deed is wholly inoperative.

4. **CONSTRUCTIVE TRUST: Evidence.** Where the facts show that the plaintiffs' property was sold under execution and purchased by the defendant at a price below its real value; that competitive bidding was prevented because plaintiffs relied upon defendant's agreement to hold the property until they could repay him the amount advanced for its purchase and any other indebtedness; that the defendant did not carry out his promise in that respect, but made deeds denuding himself of the title, the property is impressed in defendant's hands and those of his grantees (they are not purchasers for value without notice) with a constructive trust in favor of the plaintiffs.

5. **PLEADING: Equity: Prayer for General Relief.** In a suit in equity under the Missouri statutes the court may give any relief consistent with the allegations and pleadings; and where the petition contains prayers for general relief, the court may give relief different from that specifically sought.

6. **LACHES: Equitable Mortgage: Payment of Debt.** Before the plaintiffs can be debarred by laches from asserting title to their property against the defendants, who took that title under an agreement to permit the plaintiffs to redeem and to apply the rents and profits to that end, the record must show that the indebtedness was discharged before the bringing of the suit and that thereafter the plaintiffs slept upon their rights.

7. **EQUITABLE MORTGAGE: Permanent Improvements: Reimbursement to Mortgagee in Possession.** Those holding land under an equitable mortgage and deed of trust are entitled to be reimbursed for all permanent improvements, enhancing the value of the land, placed thereon by them while the property is in their hands.

Appeal from Bollinger Circuit Court.—*Hon. Charles A. Killian*, Judge.

REVERSED AND REMANDED (*with directions*).

*Charles G. Revelle, David W. Hill, Erastus R. Lentz* and *Sam M. Phillips* for appellants.

(1) From the twelfth day of February, 1896, Mary A. Jackson, through her husband and agent, was in the possession of all the farm lands in the petition. So that we have here the case of a mortgagee (or what is the same thing, the beneficiary in a deed of trust) in possession of the mortgaged property. Therefore she was a constructive trustee for the use and benefit of these plaintiffs and is bound to account for all the rents and profits in the due course of administration. Perry on Trusts (3 Ed.), sec. 243; Anthony v. Rogers, 20 Mo. 281; Ely v. Turpen, 75 Mo. 86; Stevenson v. Edwards, 98 Mo. 622; Turner v. Johnson, 95 Mo. 431; Hanna v. Davis, 112 Mo. 599; Baker v. Cunningham, 162 Mo. 140. (2) She held the property described in the petition in a three-fold trust relation toward the plaintiffs. (a) The trust clause in the deed of trust in which she was beneficiary constituted her the trustee of an express trust. All of the elements of an express trust are here present. 1 Perry on Trusts (3 Ed.), sec. 82; Guinnotte v. Ridge, 46 Mo. App. 257; Jones v. Shepley, 90 Mo. 431. (b) When she in person or by her agent took possession of the land described in the deed of trust, in which she was beneficiary, and under the deed of trust, she assumed the relationship of mortgagee in possession of the mortgaged property and thereby became the trustee in a constructive trust for the use and benefit of the plaintiff, so far as the lands described in the deed of trust were concerned. 1 Perry on Trusts (3 Ed.), sec. 243; Anthony v. Rogers, 20 Mo. 281; Ely v. Turpin, 75 Mo. 86; Turner v. Johnson, 95 Mo. 431; Stevenson v. Edwards, 98 Mo. 622; Hanna v. Davis, 112 Mo. 599; Baker v. Cunningham, 162 Mo. 140. (c) When, through her husband and agent, she made the agreement with the plaintiffs to furnish the

money to pay off the judgment in favor of the Dunklin County Bank, upon which execution had been issued and levied upon the property in controversy, together with the town lots in Malden, which were not described in the deed of trust, and to hold the same under the same conditions as described in the deed of trust, upon the promises of the plaintiffs to repay her the amount of money so paid out by her and when she did, through her husband and agent, bid in the property, in the name of her husband and agent, and afterwards he conveyed the land to her, she became the trustee of an· implied or resulting trust in favor of the plaintiffs in so far as the town lots in the deed of trust were concerned. Perry on Trusts (3 Ed.), secs. 112, 122, 124; Reilly v. Cullen, 159 Mo. 330; Phillips v. Hardenberg, 181 Mo. 464; Richardson v. Champion, 143 Mo. 538; Leahy v. Witte, 123 Mo. 207; O'Fallon v. Clopton, 89 Mo. 268; Shaw v. Shaw, 86 Mo. 594; Gillespie v. Stone, 70 Mo. 505; Fairy v. Kennedy, 68 S. C. 255; Swick v. Pease, 59 S. E. (W. Va.) 510; Elliott v. Machine Co., 139 S. W. 356; Damschroeder v. Thias, 51 Mo. 100; McNew v. Booth, 42 Mo. 189; Rose v. Bates, 12 Mo. 21; 10 Current Law, p. 1914. (d) There can be no question but that under all the circumstances in this case, both Colonel Phillips and Doctor Jackson, the latter acting either for himself or agent for his wife, understood and regarded the transaction of March 17, 1897, as a security for the money then advanced and paid by Doctor Jackson. Consequently the transaction must be regarded in a court of equity as a mortgage. 2 Story on Equity Jur., sec. 1018; 2 Jones on Mortgages, sec. 1039; Reilley v. Cullens, 159 Mo. 330; Bobb v. Wolf, 148 Mo. 335; Book v. Beasley, 138 Mo. 455; Hargadine v. Henderson, 97 Mo. 375; O'Neil v. Capelle, 62 Mo. 202; Turner v. Kerr, 44 Mo. 429. (e) The evidence of Jackson renders it clear beyond controversy that Phillips was to have the land back on certain contingencies. This transaction of March 17,

1897, was either a mortgage or a conditional sale. Which was it? Whether an instrument constitutes a mortgage or conditional sale depends upon the intention of the parties as shown by attendant circumstances, but if the intention is doubtful or not clearly expressed, it will be construed a mortgage. 14 Current Law, p. 888; Donovan v. Boeck, 217 Mo. 86; Moorhead v. Ellison, 120 S. W. (Tex.) 1049. (3) The express trust, created by the deed of trust of February 12, 1896, can never be terminated except by its complete execution, or by the full consent of all the parties in interest. 1 Perry on Trusts (3 Ed.), sec. 104; Newton v. Rebeneck, 90 Mo. App. 657; Smith v. Smith, 70 Mo. App. 451; Ewing v. Warner, 47 Minn. 446; Ewing v. Shannahan, 113 Mo. 196. (4) The deed of trust for $6700 was by its very terms in the nature of a mortgage, and the transaction of March 17, 1897, being in equity a mortgage, and neither having been foreclosed in any manner provided by law, plaintiff's right of redemption still continues. 2 Jones on Mortgages (3 Ed.), sec. 1039; 2 Story, Equity Jur. (9 Ed.), sec. 1019; Reilly v. Cullen, 159 Mo. 328; Gerhardt v. Lucker, 187 Mo. 46; Duell v. Leslie, 207 Mo. 666, and cases cited; Jones v. Gillett, 118 N. W. (Ia.) 314; Griffin v. Cooper, 68 Atl. (N. J. Eq.) 1095; 2 Perry on Trusts (3 Ed.), secs. 821, 822; Blauvelt v. Ackerman, 23 N. J. Eq. 493; Pomeroy v. Benton, 77 Mo. 84. (3) When by the terms of the mortgage, or by subsequent agreement, the mortgagee is to take and hold possession of the property until he shall satisfy his claim from the rents and the profits, his possession does not become adverse until his claim has been satisfied from that source, or he asserts an absolute title in himself, and he gives distinct notice to the mortgagor. 2 Jones on Mort. (3 Ed.), secs. 1152, 1153; Cockrell v. Stafford, 102 Mo. 69. (4) In order to create an estoppel by laches it is necessary that the plaintiff should be shown to be guilty of negligence.

and sleeping on his rights. Perry v. Craig, 3 Mo. 516; Miller v. Bernecker, 46 Mo. 194; Smith v. Washington, 11 Mo. App. 519; Ibid., 88 Mo. 475. In this case the defendants were in possession of the premises under a deed of trust requiring them to collect the rents and apply them to the payment of interest, taxes and principal, until their debt was fully paid. This time had not arrived when this suit was brought. The Statute of Limitations has not begun to run. The time had not yet arrived when the plaintiffs were required to take any action.

*E. A. Rozier, N. A. Mozley* and *Ralph Wammack* for respondents.

(1) A. Under the brief of appellants it must appear that they are presenting this cause upon the following four theories: (a) That the facts constitute an express trust. (b) That the facts constitute a trust *ex maleficio*. (c) That the facts establish a mortgage, with the mortgagee in possession by agreement. (d) That they have the right to join them all together, and take the benefit of all of them, and failing so to do, to treat the transaction as a conditional sale, or as some sort of constructive trust not named, or as a resulting trust; or perhaps as a final resort, ask for specific performance. B. The issues in this cause must be determined from the petition of plaintiffs; and this cause must here be tried upon the theories advanced in the lower court. No citation of authorities is required to show that this court will only retry this case upon the issues made by the pleadings and the theories upon which it was tried below. C. The pleadings, especially the petition in the case, only set up facts that would either constitute an express trust or a trust *ex maleficio*; and there are no statements of facts upon which a chancellor could consider the question of a conveyance absolute upon its face being in fact a mort-

gage. D. All the authorities cited by appellant relating to absolute conveyances being held to be mortgages; and all authorities relating to the duty of a mortgagee in possession cannot be considered by the court. Weiss v. Heitkamp, 127 Mo. 29. E. Appellants should be prepared to state upon which ground they stand, either for the establishment of an express trust or a trust *ex maleficio;* and unless they are so prepared this court should determine from the allegations of the petition this matter. But we do insist that this court can only permit them to stand upon the one or the other, under the allegations made in the petition. Richardson v. Champion, 143 Mo. 538; Curd v. Brown, 148 Mo. 82; Heil v. Heil, 184 Mo. 665. (2) (a) The facts show that they are seeking to establish an express trust, as distinguished from one arising by operation of law. Heil v. Heil, 184 Mo. 665; Bispham's Pr. of Eq. (4 Ed.), sec. 80; 2 Pomeroy's Eq. Jurisprudence (2 Ed.), sec. 987; Hammond v. Cadwallader, 29 Mo. 166; Richardson v. Champion, 143 Mo. 538; Hillman v. Allen, 145 Mo. 638; Price v. Kane, 112 Mo. 412; Mount Calvary v. Albers, 174 Mo. 331; Miltenberger v. Morrison, 39 Mo. 71; Weiss v. Heitkamp, 127 Mo. 23; Cawley v. Crafton, 191 Mo. 421. (b) If an express trust, then same must have been evidenced by some writing, executed by the party to be charged. Heil v. Heil, 184 Mo. 665; Mulock v. Mulock, 156 Mo. 431; Weiss v. Heitkamp, 127 Mo. 27; Hillman v. Allen, 145 Mo. 638; Woodford v. Stephens, 51 Mo. 443; Green v. Cates, 73 Mo. 115; Curd v. Brown, 148 Mo. 82; Mt. Calvary v. Albers, 174 Mo. 331. (c) If there was a verbal agreement on March 17, 1897, attempting to create an express trust, and the trustee thereafter refused to perform, then such refusal would not constitute him a trustee *ex maleficio.* Weiss v. Heitkamp, 127 Mo. 23; Green v. Cates, 73 Mo. 115; Heil v. Heil, 184 Mo. 665; Russell v. Geyer, 4 Mo. 384; Price v. Kane, 112 Mo. 412. Reference may be had to

the prayer of the petition as well as the facts stated, to determine whether an express trust is sought to be established.  Heil v. Heil, 184 Mo. 665; Hillman v. Allen, 145 Mo. 638.  (d)  The petition in this case, and the evidence given by the plaintiff, shows an express trust is sought to be established. Note petition in Mulock v. Mulock, 156 Mo. 435; Hillman v. Allen, 145 Mo. 638; Miltenberger v. Morrison, 39 Mo. 71; and Price v. Kane, 112 Mo. 412.  (e)  If not an express trust all the authorities cited by appellants as to laches, must fall with the proposition upon which it is based. Bobb v. Wolff, 148 Mo. 335.  (f)  The money advanced by Dr. Jackson on March 17, 1897, cannot be tacked on to any prior indebtedness, because within the Statute of Frauds.  O'Neill v. Capelle, 62 Mo. 202; Curle v. Eddy, 24 Mo. 117.  (3)  (a)  If the court holds that the petition does not set up an express trust, then under the allegations the only form of implied trust that could arise would be a trust *ex maleficio*.  Richardson v. Champion, 143 Mo. 538.  Heil v. Heil, 184 Mo. 665; Rose v. Bates, 12 Mo. 30; Hammond v. Cadwallader, 29 Mo. 166; Baier v. Berberich, 6 Mo. App. 540; Leahy v. Witte, 123 Mo. 207; Richardson v. Champion, 143 Mo. 545; Phillips v. Hardenburg, 181 Mo. 474; Berlin v. Bieler, 96 Mo. 91; Mulock v. Mulock, 156 Mo. 435; Slowey v. McMurray, 27 Mo. 113; Groves v. Fulsome, 16 Mo. 543; Turner v. Johnson, 95 Mo. 446; Grumley v. Webb, 44 Mo. 454; Curd v. Brown, 148 Mo. 92.  (b) No cause of action unless such matters are alleged and proven.  Hammond v. Cadwallader, 29 Mo. 166; Miltenberger v. Morrison, 39 Mo. 76; Phillips v. Hardenburg, 181 Mo. 463; Rogers v. Ramey, 137 Mo. 598; Miltenburger v. Morrison, 46 Mo. 251.  (c)  Four things should occur to create a trust *ex maleficio*.  Gillispie v. Stone, 70 Mo. 505; Hammond v. Cadwallader, 29 Mo. 166; McNew v. Booth, 42 Mo. 189; Reel v. Ewing, 71 Mo. 17.  (d)  Unless the purchaser aided in preventing bidding, no trust arises; and it is not sufficient that

the plaintiff alone prevented such bidding. Gillispie v. Stone, 70 Mo. 505; McNew v. Booth, 42 Mo. 189; Hammond v. Cadwallader, 29 Mo. 166. (e) Unless the party to be charged as a trustee did something to prevent the property from bringing its full value, he cannot be a trustee *ex maleficio*. Taylor v. Von Schraeder, 107 Mo. 206; Gillispie v. Stone, 70 Mo. 505; McNew v. Booth, 42 Mo. 189; Baier v. Berberich, 6 Mo. App. 537; Hammond v. Cadwallader, 29 Mo. 166; Russell v. Geyer, 4 Mo. 384. (f) Trusts *ex maleficio* are only for the purpose of permitting the debtor to redeem from the purchaser the property obtained under the agreement; and where the property was obtained under circumstances amounting to fraud; and then only where the debtor offers to redeem within a reasonable time. Phillips v. Hardenburg, 181 Mo. 463; Rose v. Bates, 12 Mo. 30; Richardson v. Champion, 143 Mo. 538; Leahey v. Witte, 123 Mo. 207; McNew v. Booth, 42 Mo. 189. (4) (a) To raise an implied trust, the proof should be so clear, and cogent as to exclude every reasonable doubt from the chancellor's mind. Bunel v. Nester, 203 Mo. 429; Mulock v. Mulock, 156 Mo. 431; Curd v. Brown, 148 Mo. 82; Reed v. Painter, 129 Mo. 674; Burdette v. May, 100 Mo. 13; Gillispie v. Stone, 70 Mo. 505; Adams v. Burns, 96 Mo. 361; Bradley v. Bradley, 119 Mo. 58; McFarland v. LaForce, 119 Mo. 585; Jackson v. Wood, 88 Mo. 76; Philpot v. Penn, 91 Mo. 38; Johnson v. Quarles, 46 Mo. 423; Berry v. Hartzell, 91 Mo. 132; Allen v. Logan, 96 Mo. 591; Kennedy v. Kennedy, 57 Mo. 73; Ringo v. Richardson, 53 Mo. 385; Kaiser v. Gammer, 95 Mo. 217; King v. Isley, 116 Mo. 155; Taylor v. Von Schraeder, 107 Mo. 206; Darling v. Potts, 118 Mo. 506. (b) The trust so created is only to permit the debtor to redeem within a reasonable time; and failing so to do, the trust relation so created is terminated. Slowey v. McMurray, 27 Mo. 116; McNew v. Booth, 42 Mo. 189; Richardson v. Champion, 143 Mo. 538. (5) (a) The transaction of March 17,

1897, could not by any possibility be treated as a mortgage. Bobb v. Wolff, 148 Mo. 345. (b) If the transaction was to permit a repurchase or redemption it cannot be a mortgage. Slowey v. McMurray, 27 Mo. 113; Bobb v. Wolff, 148 Mo. 348; Turner v. Kerr, 44 Mo. 433; Forester v. Moore, 77 Mo. 661; Slowey v. McMurray, 27 Mo. 113; Duell v. Leslie, 207 Mo. 658; Donovan v. Boeck, 217 Mo. 70. (c) If there was no debt, no mortgage could follow, and there must first be proof of debt. O'Neil v. Capelle, 62 Mo. 206; Donovan v. Boeck, 217 Mo. 87; Book v. Beasley, 138 Mo. 463; Reel v. Ewing, 71 Mo. 17; Duell v. Leslie, 207 Mo. 658. (d) Under facts like the present we cannot conceive how a purchaser at sheriff's sale can by parol create either a mortgage or a conditional sale. Such transactions must of necessity be limited to conveyances from the grantors to the grantees upon some parol agreement as to either a repayment of a loan then due or a debt then assumed by the grantee which the grantor agrees to pay; or such agreement must give the grantor the right to repurchase within a stated or reasonable time. And all agreements at forced sales to buy and give the party having some beneficial interest in the land at the time of sale can only create a trust *ex maleficio.* Bobb v. Wolff, 148 Mo. 335; Duell v. Leslie, 207 Mo. 658; Turner v. Kerr, 44 Mo. 443; Forrester v. Moore, 77 Mo. 661; Donovan v. Boeck, 217 Mo. 70; Bailey v. Trust Co., 188 Mo. 483. (6) This transaction was not a mortgage and not a conditional sale; but if so the time for its completion has long since passed. Duell v. Leslie, 207 Mo. 658; Bobb v. Wolff, 148 Mo. 335; O'Neil v. Capelle, 62 Mo. 206.

BOND, C.—This suit was begun by H. N. Phillips and wife, Susan A. Phillips, in the circuit court of Dunklin county, Missouri, on the 25th day of May, 1904, against Robert J. Jackson and wife, Mary A. Jackson.

Robert J. Jackson having died, the case was revived against his heirs, and after change of venue to Bollinger county, plaintiffs filed an amended petition setting forth, in substance, that on the 12th day of February, 1896, they were the owners of a section of land situated in Dunklin county, Missouri (describing it), of the net rental value of about $1500; that being indebted to defendant Mary A. Jackson for various loans made by her and debts assumed by her, amounting to $6700, they, on the 12th of February, 1896, executed and delivered to said Mary A. Jackson their promissory note for $6700, payable on January 1, 1897, with interest at 8 per cent per annum, and at the same time delivered to her a deed of trust conveying all of the said section of land to R. P. O. Montgomery as trustee for the benefit of said Mary A. Jackson, and which deed of trust in addition to the usual provisions contained the following:

"And it is hereby further stipulated and agreed by and between the parties herein, that the proceeds arising from the renting of the said land shall, from year to year, and as long as the debt herein mentioned remains unpaid, be collected by the party of the third part, your wife, or her agent, you, and shall be applied as fast as collected as follows: 1st, In payment of the interest of the debt; and, 2nd, In payment of the annual taxes of said land; 3rd, The remainder to be paid on the principal of this debt and so on from year to year until this debt is fully paid."

And that on the 1st of January, 1897, they turned over the possession of said land to Robert J. Jackson as the husband and agent of Mary A. Jackson to have and to hold in pursuance of the uses and trusts contained in said deed of trust; that on the 1st day of October, 1896, plaintiffs were the owners of twenty-one town lots situated in the city of Malden, Dunklin county, Missouri; that on the 2nd day of October plaintiffs suffered judgment in the circuit court of Dunklin

county in favor of the Dunklin County Bank and others for the sum of $345.65 and costs; that an execution upon said judgment was duly issued and was levied by the sheriff of Dunklin county upon the section of land described in the aforesaid mortgage, and also upon the aforesaid town lots, and sale thereunder advertised for the 17th of March, 1897; that on that day and before said lands were offered for sale under said execution, the said Mary A. Jackson, by the said Robert J. Jackson, her husband, as her agent and in her behalf, procured plaintiffs to agree to exclude all other purchasers from the sale of said lands and to permit the sheriff to sell the same in bulk to the said Robert J. Jackson, as agent of his wife, Mary A. Jackson, for the nominal price of $1000, although said land was worth the sum of $35,000; that to induce such transaction, the said Mary A. Jackson by her husband and agent, Robert J. Jackson, agreed that he as agent for his wife would take a sheriff's deed to the whole of said lands for the said sum of $1000, and hold them subject to the same trusts that were set forth in the aforesaid deed of trust; and that plaintiffs should have the right to procure buyers for all or any part of said land at any time, and that necessary deeds to convey the same would be made by Mary A. Jackson and Robert J. Jackson, her husband, and that the proceeds of all or any such sales should be applied to the payment of the debt owing by these plaintiffs in full or in part.

Plaintiffs allege that they relied wholly upon these promises and agreements, and permitted the sheriff to execute a deed to the said Robert J. Jackson as agent to his wife, conveying all the lands for the said sum of $1000. Although there were many prospective bidders present at the time of said sale, the said lands were never offered by separate lots or tracts, and the sum of $1000 was a grossly inadequate price; that upon the day following said sale plaintiffs surrendered

240 Sup.—21

possession of the town lots to the defendants; that the defendants continued to "recognize the trust aforesaid" until the 2nd of February, 1898, when they attempted to repudiate the same and to cheat and defraud the plaintiffs by fraudulently conveying by general warranty deed of Robert J. Jackson to his wife, Mary A. Jackson, all the lands described in this petition for the nominal sum of $2000; that Mary A. Jackson had full knowledge of all the facts alleged when said deed was taken by her; that since the 3rd day of February, 1898, the said Robert J. Jackson and Mary A. Jackson refused to account for the whole or any part of the rents received by them on said lands or to apply the same as had been agreed upon to the extinguishment of the indebtedness from plaintiffs to them, but have wrongfully and fraudulently claimed to be the owners in fee of all the lands conveyed by the sheriff's deed aforesaid.

The petition then sets out the names of the heirs and children of Robert J. Jackson to whom they have made conveyances of certain interests in said lands, alleging such conveyances were with full knowledge on the part of the grantees of the trusts to which said lands were subject and were taken without valuable considerations.

The petition prays the court to set aside the sheriff's deed, and to adjudge the defendants to be trustees of the land thereunder conveyed as shown by the terms of the deed of trust to them and as was agreed between the parties before the sheriff's sale of all of said lands; that all conveyances between Robert J. Jackson and his wife and between them and any of their children be set aside and held for naught; that an account be taken and plaintiffs be permitted to pay any sum that may be due from them to the defendants, and for general relief.

Some of the defendant heirs filed general denials; two of them and the mother, Mary A. Jackson, in addi-

tion to general denials, set up that the plaintiffs had foreborne to take any action to assert any right or claim since the 1st day of January, 1897, at which date they well knew that Mary A. Jackson was in actual possession of said property, asserting ownership thereto, and had made valuable and lasting improvements thereon; that the property in question had increased greatly in value since that time by reason of the improvements put on by the said Mary A. Jackson and the general enhancement of values in that vicinity.

Issues were joined by replication. The execution of the trust deeds and the other deeds referred to in the petition was not disputed. The contrariety of evidence relates to what was the agreement between H. N. Phillips and Robert J. Jackson, acting for their respective wives, at the time of the sale of all the land under execution on March 17, 1897.

H. N. Phillips testified, in substance, that he and Jackson reached an agreement before the sale that the property should be sold in bulk and bid in by Jackson for $1000; that he told the sheriff of this agreement and requested him to offer the property for sale as a whole; that Doctor Jackson's bid for this amount was the only one made, and the land was struck off at once to him; that there were other prospective bidders who were informed of this agreement; that the understanding between himself and Doctor Jackson was this: "That the land included the town lots upon which he had no mortgage, and the whole thing be sold for $1000, and he was to go on and do as he agreed to do in the deed of trust for $6700; and when he paid himself out of the rent of that land it was to be turned over to us. He was to proceed under the provisions of the $6700 deed of trust. At the time of the sale he had had possession of the farm land since October the year before. Immediately after the sale the town lots were turned over to Jackson."

This witness testified that at the time of the sale of these lands the farm lands were worth $15,000 and the twenty-one town lots were worth $2500; that he subsequently received letters from Doctor Jackson bearing upon the agreement had between them at the time of the sheriff's sale of the land. Some of these letters, running through the year 1896, referred to the condition of things prior to the sheriff's sale while the farm lands were encumbered only by deed of trust in favor of Doctor Jackson's wife. The first one, February 6, 1896, referred to the lending of $200, saying if it was not called for promptly it would be loaned to another party. The second one, June 2, 1896, and the third one, June 4, 1896, referred to a proposition of some parties from Cape Girardeau to buy the land encumbered by the deed of trust, and asking H. N. Phillips to state explicitly how much money he would want down and other terms of the sale. Another letter of July 11, 1896, contained a request to enclose the crop leases on the farm so that Doctor Jackson could collect them. The next one, October 8, 1896, acknowledged receipt of these contracts and spoke of them as aggregating $1000, but said the writer (Doctor Jackson) thought that they were to be $1500. The other letters were after the sheriff's sale. Thereafter, on July 12, 1897, the following letter was sent:

"Office of Robert J. Jackson, Physician and Surgeon, Bloomfield, Mo., July 12, 1897. H. N. Phillips, Atty. at Law, Poplar Bluff, Mo. Dear Friend I have today received an account of the land rented is about 500 acres rented from about $2.75 to $3.00 per acre and I think the land is all rented. I wish you was over and let us see about some plan of work for the future. I want you to write me by return and I will go down and see about the matter and find if any is not rented. Yours as ever, Robert J. Jackson."

On the back of this letter was an indorsement of the names of the tenants and the number of acres and

the price per acre paid by them, showing 499 acres of land were rented for $1354.35. Another letter of date August 13, 1897, referred to getting up money for the payment of the "Dexter note," secured by mortgage, which the writer said he would pay and "hold until the papers in the matter were fixed up in full." Another one of date August 17, 1897, referred to the same transaction. In another one dated October 11, 1897, Jackson requested Phillips to inform him whether he desired the land surveyed at a cost of eight dollars, stating that the additional rent would pay more. Another letter dated December 24, 1897, asked instructions of Phillips as to the building a house on one of the town lots at a cost of $150; spoke of having received $806 in rents, and that part of it had been used to pay the "Dexter note and taxes;" that $150 more would be coming, and asked should that be paid on the house. The letter then said Mr. Bledsoe (a mutual agent employed by the parties after the sheriff's sale) had rented all the lands but the Dell Thomas forty for three dollars per acre, and he could rent it at the same price; and the letter further asked the advice of Mr. Phillips as to building a fence a mile long on the farm, and requested an answer by return mail.

The testimony of Mr. Bledsoe, who was put in charge of the farm lands after the sheriff's sale, was, in substance, that he was familiar with the market value of the land in 1897; that it was worth twenty dollars an acre, that the town lots were worth from $100 to $250 apiece; adding, "The reasonable rental value of this farm in 1897 was three dollars per acre. I rented it for that. I do not think I have rented over 500 acres. I rented 500 acres at three dollars per acre." Adding, "Doctor Jackson came down and went over the land with me, he said that he didn't want to have any more improvements made on the land than was really necessary; that Mr. Phillips did not want any more and he didn't either, but he wanted to see

his money back out of this. Mr. Phillips was to have it back and the rents were to be applied on.the taxes, interest, improvements, etc. That the rent was to be applied to the debt. That was after the sale.''

Witness then refers to some improvements, and adds, ''I had charge of the land from 1897, in March, to 1899, about December, I think. I collected the rent on the place for Doctor Jackson for the years 1897, 1898, and 1899. I was in charge of the place for Doctor Jackson so far as collecting the rent was concerned. . . . I was put in charge of that place by agreement of Doctor Jackson and Mr. Phillips. I was to collect the rent and turn it over to Mr. Jackson. They agreed on me to do that. That was on the day of the sale at Kennett after the sale was made.'' Adding, ''These conversations that I had with Doctor Jackson in which it was said that the rents were to be paid by me to Doctor Jackson and that Doctor Jackson was going to let Colonel Phillips sell the place, occurred along at various times. It was there at Kennett that I first heard of it, and at various other times Doctor Jackson would come down and go out with me over the farm. At one time I asked him what he would take for a certain piece of land. He said, 'I couldn't sell it. I promised to deed this back to Mr. Phillips when I got my money back.' ''

For the plaintiff, Thomas Bradley testified, in substance: ''I heard a conversation just after the sale between Colonel Phillips and Doctor Jackson. I think they were in the hall near the sheriff's office, and Doctor Jackson said to Mr. Phillips that he didn't want the land; all that he wanted was his money and the interest out of it, and they spoke of an agent that would collect the rent and pay it over to Doctor Jackson. The Doctor says it won't take many years to pay up. He said Mr. Phillips was to have the land; that he would deed the land back to him. I was present when the sheriff sold the land. I was deputy sheriff at that time.

There was but one bid for the land, by Doctor Jackson for $1000. Prior to that bid Mr. Phillips told the sheriff to sell it all together, the town lots and all, put it all up in block and sell it all. Doctor Jackson was to bid it in; that they had agreed to that effect.'' He added: ''There were other persons there, some of whom told me that they were thinking of bidding but 'it was a compromise and they wouldn't bid at the sale.' ''

Hugh Mitchim also testified for plaintiffs, in substance, that he kept a livery stable at Malden, and when Doctor Jackson came down, went over with him to show him the land, with which witness was entirely familiar; that he took him to the different renters, one of whom, Dell Thomas, wanted a house built; ''that Dr. Jackson replied, he could not do this because Phillips did not want any improvements on the land except what was absolutely necessary to cultivate it. He didn't want any improvements put on the land because he wanted the land to be paid out as quickly as possible, as quick as he could. As quick as he could get the principal, note and expenses out of the land he would have to deed it back to Phillips.'' That witness also asked Doctor Jackson what he would take for the McQuerter land. Jackson replied ''that he could not sell it to anybody; that he was holding the land for Mr. Phillips, and could not sell it unless Mr. Phillips agreed to it.''

Dell Thomas, one of the tenants on the farm, testified for plaintiffs that he requested Doctor Jackson to build him a house, and he replied to him, ''I can't build the house for this reason: Mr. Phillips don't want to be put to any more expense than he can help and I don't either, because I want to get my interest and turn the land back to Mr. Phillips.'' That this conversation took place in the last of March, 1897; that Doctor Jackson and Mr. Mitchim were in a buggy; that the witness

gathered his crops for that year and moved to the lower end of the county.

Plaintiffs introduced the deposition of Doctor Jackson. This witness stated on cross-examination, that he went to Kennett on the day of the sheriff's sale, March 17, 1897, as the agent of his wife; that all he did there was as her agent. He added, "My wife's mortgage did not cover the town lots. I did not say I agreed with Colonel Phillips, on the day of sale at Kennett, that I would buy in all the land advertised for sale in bulk and that he should redeem it from me in any time within two years. I did not say that I had agreed with Colonel Phillips at all; I never made an agreement with Mr. Phillips. One of his friends called to me and took me to a room and plead with me to buy it, and he guaranteed that Phillips would take it off my hands within two years; that party was Mr. Wear; he was the judge of the court then, and he was the man that made the agreement. I just told him, 'Judge, if you will guarantee this to me, I will buy the land in question in for two years.' I was to have possession of the farm immediately. After I bought it, I went into possession. I did that." Witness added that there was no agreement as to rents; that his first bid was for $1000, and that no one bid against him; that he understood that was the amount of the indebtedness. Adding, "At any time that Phillips wanted the land back within two years he was to have it; he was to pay me just every dollar that I was out; there was not a word said about giving him credit for the rents I had collected in the meantime."

"Q. Then I understand you that Mr. Phillips at any time within two years could take the land all back that was sold that day by paying you the $1000 and pay the $6700, due to your wife, with interest on that account. A. And any other indebtedness whatever it might be. Q. Well, what other indebtedness was talked about? A. Well, there was several little

debts that he owed me besides; some of them very small and some of them not so small. . . . Q. Then you have been willing all the time to collect what money you and your wife had been out on this land and make a deed back to the Colonel for the land? A. No, sir; I am not willing now; he has let it run too long. The land is not mine at the present time. My son-in-law, Ed Moore, owns one-half of it, and my daughter, Myrt Jackson, owns the other part; the lots not conveyed are in my wife's name.'' He added that he could not tell when these deeds were made but they were before the present suit. ''It is a part of my estate; I have divided all the lands I had among my children, and it is part of my estate; it was simply an advancement by myself and my wife to my children.'' He also stated that he had never entered satisfaction on the records of the note for $6700 and the deed of trust securing the same; that he paid the $1000 to the sheriff out of his wife's money, and she agreed to abide by any agreement that he made. He also stated, ''I believe to the best of my opinion that this two-year arrangement was agreed upon before the sale,'' and further, ''I have used the money collected as rents on this land over and above improvements and taxes as my own property.''

For defendant, J. G. Wear testified that on the day of sale, during the session of the circuit court, of which he was judge at the time, with the assent of Mr. Phillips, he called on Doctor Jackson to get him to buy in the land and explained to him that he thought he would be safe in doing so, and that he thought Phillips could pay it off in a year; that Jackson replied, ''I will give him two years; if he can redeem in two years he can have it;'' that this witness went back and told Phillips what Jackson had proposed to do, and said that was the best that could be done. Witness knew nothing about any further agreements between the parties. At the time of his testimony he

said he had been retained by defendants as an attorney in the case and was also a witness.

Defendants read the depositions of R. H. Jones, who drew up the sheriff's deed at the time of the sale of the land, March 17, 1897, and who testified that he was paid for this by Doctor Jackson, to whom he delivered the deed, finding him at the time in the sheriff's office in company with Mr. Phillips; that when he spoke of his business (to deliver the deed) he was asked to wait until an agreement between them was made; adding, "As best as I now remember Mr. Phillips was wanting time in which to redeem from Doctor Jackson on the land that was described in this particular deed. Doctor Jackson was insisting on receiving his money, that he did not want the land but he could not give him the time to redeem the same that Mr. Phillips was wanting. Mr. Phillips asked him if he would not give him five years, I think it was five, in which to redeem it, and the Doctor refused to do it, but offered to give Phillips one year. Mr. Phillips told the Doctor that was not what he had agreed to do before he purchased the land and that he was trying to hold him up. For some little time after that the discussion was pretty warm between them and Doctor Jackson finally said he would give him two years in which to redeem the land and not any more. The Doctor paid me what was due. I delivered the deed and left him and Mr. Phillips in the sheriff's office disputing over the matter.

The trial court made a finding of facts and law, and dismissed the petition for the reason that plaintiffs, in his opinion, had failed to make out their case with that degree of certainty required, and that if they had, they would be debarred by laches  From this decree plaintiffs perfected their appeal to this court.

## OPINION.

I. Prior to the sale under execution of all the lands described in this suit, the respective interests of plaintiff and wife on the one hand and Doctor Jackson and wife on the other were fully defined by the terms of the trust deed executed in February, 1896, and the parties thereto had the rights and were subject to the duties prescribed in that instrument, and no others. The important question, therefore, is, What change was created by the transactions through which Doctor Jackson got the sheriff's deed to the mortgaged property and some twenty-one town lots, embraced in the mortgage?

There is no room under the facts in this record for the application of the technical doctrine of merger of two titles. That rule is upheld in equity when it accords with the intention of the parties, but it is neither upheld in equity nor at law unless two titles, a greater and a less, have coalesced in the same person. In the case at bar the deed of trust on the farm was to a third party for the benefit of Mrs. Jackson, and the sheriff's deed was made to R. J. Jackson; hence, there was no merger and this point may be excluded from view in the further discussions of the case. This leaves the transaction with only three possible aspects. Was it a conditional sale, an equitable mortgage or a constructive trust arising out of the wrongdoing of the purchaser?

The equitable principles governing these three subjects are clear and fixed. They have been repeatedly announced by this court. Whether a given state of facts constitutes a conditional sale of land vesting the title in the buyer, subject only to a right on the part of the seller to rebuy within a specified time, depends upon the intent that this should be so, and the extinguishment of all indebtedness, past, present and future, between the parties. For, if any indebtedness between them survives the transaction, or if it is in-

tended to secure a present loan, or to provide against future liability, then the transaction is *ipso facto* an equitable mortgage however absolute may be the form of the conveyance. If the evidence afforded by the instrument and the attending facts and circumstances leaves it in doubt whether a sale with a right of repurchase or an equitable mortgage was intended, courts of equity will resolve this doubt in favor of the creation of a mortgage. The character of the transaction is determined in its inception. If it was a mortgage in the beginning, it remained so; if a conditional sale at the start, no lapse of time will change it into a mortgage. [3 Pomeroy's Eq. Jur. (3 Ed.), secs. 1193, 1194, 1195, 1196, 1197, and notes; Jones on Mortgages, secs. 264, 265 and 272; Turner v. Kerr, 44 Mo. 429; Reilley v. Cullen, 159 Mo. 322; Reilley v. Cullen, 101 Mo. App. 32.]

In the case at bar there is no dispute that the amount of the bid to be made at the execution sale on the property was fixed by agreement at one thousand dollars; that the property was purchased at and for that sum upon one bid. The amount of the execution was about four hundred dollars. The surplus of this bid is not claimed to have been paid to the plaintiffs or either of them. The plaintiffs contended that it was to be applied to an indebtedness on their part to the Dexter Bank of about $456. It appears from a letter written by Dr. Jackson that this was subsequently done, for in his letter of August 13, 1897, he spoke of paying that debt; adding that he would "hold the papers until the matter is fixed up in full." This was five months after he had acquired the deed to the property at the sheriff's sale. It is not claimed in this case that any note representing the previous indebtedness of the plaintiffs to Doctor Jackson and his wife was given up or surrendered or paid at the time of this purchase under the execution sale. On the contrary, any and all evidences of debt which ever ex-

isted in their favor against the plaintiffs are, as far as this record shows, subsisting yet.

Again, it appears from the positive statement of several witnesses that immediately after the acquisition of the sheriff's deed, Doctor Jackson to them and in their presence stated that he could only make such repairs as were necessary to the cultivation of the land or to secure rent of the town lots, since Mr. Phillips did not want any other expenses to be incurred, in order that the indebtedess due to Doctor Jackson should be paid. as soon as possible, and the property deeded back to Mr. Phillips. Again, the manager of the property, Mr. Bledsoe, who was in charge of it immediately after the sale to Doctor Jackson, stated that Doctor Jackson explained to him that no more improvements must be made than were necessary, for Mr. Phillips "was to have it back and the rents were to be applied on the taxes, interest, improvements, etc.; that the rent was to be applied to the debt."

Under this state of facts the conclusion is irresistible, that the transaction in question was not an absolute sale of the property based upon the extinguishment of all indebtedness between the parties, leaving the plaintiffs the mere right of repurchase within two years.

II. Was it an equitable mortgage? The circumstances surrounding the transaction of purchase at the sheriff's sale were, in brief, these: Jackson's wife held a note of plaintiffs' for $6700, covered by deed of trust on their farm. The equity in these lands had been levied upon under an execution which was also levied upon twenty-one town lots. Jackson admits he agreed before this sale to buy in the property and give plaintiffs two years to redeem. He bought it for the price fixed by agreement at one bid. It was sold in a lump, no other bids being made. Immediately on getting

his deed he took possession and placed a man (Bledsoe) in charge. He never surrendered the note to plaintiffs nor cancelled the deed of trust securing it. He stated to Bledsoe, to the tenants, and to other persons, that the land must be worked as economically as possible, because the "rents must be used to pay the interest, taxes and principal debt due him and that he must then deed the property back." In his letters running through a year after his purchase, he counseled with Mr. Phillips as to the various steps to be taken in the cultivation and improvement of the land and the collection of rents.

To our minds the proof as to these facts is positive and convincing; and resting largely on the written statement of Doctor Jackson, it leaves no doubt but that he intended at the time to hold the property under the sheriff's deed for the purpose of security and repayment of the note for $6700 and the amount, $1000, which he bid for the lands. This being his intention, as well as the intention of the plaintiffs at the inception of the transaction, its character as a mortgage was thereby ineffaceably stamped upon it under the settled rules of law. The result was that he became trustee of the town lots under an equitable mortgage; and the sheriff's deed to him in so far as the town lots are concerned became in the eye of a court of equity a mortgage on them to secure any and all the indebtedness from the plaintiffs to himself and wife.

The mortgage thus created by the acts and in accordance with the intention of the respective parties of necessity remained a mortgage, and the deeds from Jackson to his wife and from them to their children, by way of advancement, did not carry any further title than he had, and left these grantees subject to the same trusts and duties which existed against him.

III. The facts in this record would also afford ground for relief against defendant Jackson and the parties who succeeded to his title (it not being claimed that they were purchasers for value without notice) on the ground that he acquired the sheriff's deed under circumstances which would entitle plaintiffs to establish a constructive trust against him and all persons in privity as to the town lots. "The forms and varieties of these trusts which are termed *ex maleficio* or *ex delicto* are practically without limit." "The doctrine is often used with great efficacy to prevent the triumph of fraud, and to protect persons under necessities, in cases where, at execution sale, or mortgage foreclosure, or other compulsory public sale, a party buys in the land under a prior fraudulent promise made to the owner that the purchaser will take the title, hold the property for the benefit of such owner, and will reconvey to him on being repaid the amount advanced for the purchase price; and having thus by fraudulent contrivance cut off competition, and prevented the owner from making other arrangements to protect his property, and having obtained the property perhaps for much less than its real value, he refused to abide by his verbal promise, and retains the land or other property as absolutely his own. Equity will relieve the defrauded owner by impressing on the property a trust *ex maleficio,* and by treating the purchaser as a trustee *in invitum."* Such transactions are not within the Statute of Frauds. [3 Pomeroy's Eq. Jur., secs. 1053, 1055, note 1, and citations; Brown on Statute of Frauds, sec. 96 and 96A; 1 Beach on Trusts and Trustees, sec. 105, note 1, and cases cited; Rose v. Bates, 12 Mo. 30; McNew v. Booth, 42 Mo. 189; Damschroeder v. Thias, 51 Mo. l. c. 103; O'Fallon v. Clopton, 89 Mo. 284; Turner v. Johnson, 95 Mo. 431; Leahey v. Witte, 123 Mo. 207; Richardson v. Champion, 143 Mo. 538; Phillips v. Hardenburg, 181 Mo. l. c. 475.]

Without reiterating the facts set forth in the statement and restated, as to their general effect, in discussing the elements of an equitable mortgage, it is sufficient to say that they disclosed clear and unquestionable proof of the sale of plaintiff's property under an execution and its purchase by defendant Jackson at a price below its real value; that competitive bidding was prevented because of the reliance of plaintiffs upon his agreement to hold the property until they could repay him the amount advanced for its purchase and any other indebtedness; that he did not carry out his promise in that respect; but without waiting a reasonable time, he made deeds denuding himself of the title to the property. The case is clearly within the reach of the equitable doctrine above quoted, which has been uniformly affirmed in this State.

We have announced the law applicable to this case on the theory that the facts made out a case of an equitable mortgage or a constructive trust growing out of his wrongdoing, saddled upon Doctor Jackson and his privies. We made these rulings to cover all the issues. The allegations of the petition are broad enough to entitle plaintiffs to redress on either theory, especially in view of the fact that it prays for general relief. The fault of the pleader consisted in his omission to state specifically the equitable theory for which he desired redress. However, it is well settled in this State, that in a suit in equity under our statutes, the court may give any relief consistent with the allegations and pleadings; and that where the petition contains prayers for general relief, it may also give relief different from the specific relief sought. [Mead v. Knox, 12 Mo. 284; Holland v. Anderson, 38 Mo. l. c. 59; Henderson v. Dickey, 50 Mo. 161; Mason v. Black, 87 Mo. l. c. 346; Vogelsong v. St. Louis Wood Fibre Plaster Co., 147 Mo. App. 578.]

Our view is that plaintiffs should recover as for an equitable mortgage against defendants as to the twenty-one town lots. As to the farm lands covered by the express trust set forth in the deed executed February, 1896, it need only be said that this instrument speaks for itself and must be enforced according to its terms. It may be foreclosed by defendant, Mary A. Jackson, or the plaintiffs may redeem thereunder before foreclosure. The sheriff's deed so far as this deed of trust is concerned is wholly inoperative and did not, under this record, affect the rights of the respective parties to said instrument.

IV.  We do not think that the plaintiffs have suffered any preclusion in this case on the ground of laches. The trust deed executed in February, 1896, seems to have been treated by the parties as a continuing trust under the provision therein for the collection of the income from the property and its application to the payment of the debt. It is not shown in this record that there has been a sufficient amount of rents collected to discharge that indebtedness. As the defendants saw fit to treat the deed of trust as a continuing security (although it contains a provision for foreclosure) they are not in a position to charge plaintiffs with laches in also treating it as a continuing security.

This action was brought in 1904, and there is nothing in the record from which we can see that plaintiffs were sooner entitled to a restoration of their property on the ground that the indebtedness against it had been paid. Hence, the defense of laches is not available to defendants. It may be on the taking of an account in this case that the plaintiffs are still indebted to the defendants; if so, they should be required to pay such indebtedness in full before recovering the property transferred to secure the same. The

240 Sup.—22

defendants are entitled to the $6700 and interest as specified; and to the $1000 paid on the sheriff's sale and interest, and should be required to account for all the rents collected by them after all proper disbursements. But they are entitled to recover the value of any permanent improvements which have been put upon the lands and which have enhanced their value. After striking a balance, the court should render a decree therefor, in favor of the proper parties; and in case plaintiffs are still indebted to defendants, the court should charge all the lands in controversy with a lien for that indebtedness until it shall have been paid.

The judgment herein is reversed and the cause remanded with directions to the trial court to proceed to take and state an account in conformity with this opinion; to decree the sheriff's deed executed to Doctor Jackson on the 17th of March, 1896, to have been intended as an equitable mortgage, and to render such further decrees as to conform to this opinion. It is so ordered. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of BOND, C., is hereby adopted as the opinion of the court. All the judges concur.