George RATERMANN, AI Ratermann and Ratermann Building and Contracting Company, a Corporation, Plaintiffs-Appellants,

v.

Bernard F. STRIEGEL and Regina C. Striegel, Defendants-Respondents.

No. 43940.

Supreme Court of Missouri.

Division No. 1.

Nov. 8, 1954.

Rehearing Denied Dec. 13, 1954.

Donald Gunn, St. Louis, for appellants.
Donald H. Stephen, St. Louis, of counsel.

William Kohn, St. Louis, for respondents.

VAN OSDOL, Commissioner.

Action in equity for a declaration that general warranty deeds, describing tracts of real estate in the City of St. Louis and in St. Louis County, were given only as security for debt. Plaintiffs also seek an accounting for monies received by defendants for their sales and rentals of some of the realty (and certain personalty) alleged by plaintiffs to have been conveyed to defendants as security. Plaintiffs alleged in their second amended petition that they had agreed to transfer, convey and deliver the described property, in trust, "to secure the repayment of said loans and advances theretofore made and thereafter to be made as aforesaid."

The described tract primarily in issue is hereinafter referred to as the "Clayton Road" property, a tract of 21.47 acres lying south of Clayton Road (U. S. Highway No. 40) in St. Louis County. We shall refer to other real estate in issue as the "Montgomery-Parnell" property, the "St. Louis Avenue" property, and the "Spring Avenue (North and South Road)" property. Plaintiffs also seek the cancellation of a 99-year lease on the Clayton Road property executed by defendants (without consulting plaintiffs) in 1950 to the Mandel Investment Company. Plaintiffs alleged the rental is grossly inadequate.

Defendants by answer alleged, inter alia, that plaintiffs, over a period of years, had become heavily indebted to defendants and that the deeds were executed and delivered by plaintiffs and received by defendants in payment and discharge of the debts. Defendants prayed for a judgment of dismissal, and prayed judgment that defendants are the absolute owners of the several tracts.

The trial court found the issues in favor of defendants, dismissed plaintiffs' petition with prejudice, and adjudged that defendants are the absolute owners of the described lands, except the Mongomery-Parnell and St. Louis Avenue properties sold by defendants in 1944 and 1945; and except a portion of the Spring Avenue property sold by defendants to one Koester in 1949, but including a portion, a tract, purchased of one Mitchell in 1939. Plaintiffs. have appealed.

Herein upon appeal, plaintiffs-appellants contend the trial court's judgment was clearly erroneous; and moreover they assert the trial court erred in excluding proffered testimony of the individual plaintiffs as to their state of mind or intention at the time the conveyances were executed. They say the state of mind or intention of the parties was the very gist of the claim and that they, plaintiffs, should have been permitted to testify they executed the conveyances only as security for debt. They further say that even without the benefit of the testimony of their intention plaintiffs sustained their burden of proving their claim, and established their right to equitable relief by clear, cogent and convincing evidence; but they also suggest that the transcript indicates there are facts undiscovered, and consequently unpresented to the trial court, which would have made certain a duty of the court to find and enter judgment for plaintiffs.

There is a presumption that an absolute unconditional conveyance of land is what it purports to be, that is, a deed. Stafford v. McDonnell, 359 Mo. 925, 224 S.W.2d 951; Wright v. Brown, Mo.Sup., 177 S.W.2d 506; Mosley v. Cavanagh, 344 Mo. 236, 125 S.W.2d 852. But a deed, absolute on its face, may be an equitable mortgage or security for debt, and a court of equity may look beyond the absolute unconditional terms of a conveyance and give effect to the intention of the parties. Stafford v. McDonnell, supra; Mayberry v. Clark, 317 Mo. 442, 297 S.W. 39. It has been said that proof to establish a deed as an equitable mortgage must be clear, cogent and convincing. Wright v. Brown, supra. Doubts are resolved in favor of the letter of the conveyance. Stafford v. McDonnell, supra; Snow v. Funck, Mo.Sup., 41 S.W. 2d 2. But a court of equity, taking cognizance of this kind of a case, will effectuate the real character of the transaction and any relevant evidence, written or oral, tending to show this is admissible. The intention of the parties, at the time of its execution, controls in determining whether an absolute conveyance from debtor to creditor was a mortgage and security, or was given as payment of debt. Blick v. Nickel Sav., Inv. & Bldg. Ass'n, Mo.Sup., 216 S.W.2d 509; Publicity Bldg. Realty Corporation v. Thomann, 353 Mo. 493, 183 S.W.2d 69. Now in reviewing this case we shall consider all of the shown circumstances surrounding the numerous transactions in resolving the issue of the parties'. intention. Pahler v. Young, Mo.Sup., 232 S.W.2d 393; 59 C.J.S., Mortgages, §§ 35 et seq., pp. 69 et seq.; Vol. III, Jones, Commentaries on Evidence, 2d Ed., §§ 1531–1534, pp. 2793–2800. And we shall weigh the evidence and decide the case, an action in equity, anew, giving due deference to the trial court's findings upon conflicting verbal testimony.

The evidence introduced is voluminous and relates to numerous transactions between the parties, plaintiffs and defendants, since September 25, 1931, at which time plaintiffs borrowed $10,000 from defendants.

Plaintiff Ratermann Building and Contracting Company (hereinafter referred to as "Company") is a corporation of which plaintiffs George and Al (Aloysius) Ratermann are officers, directors and controlling shareholders. The individual plaintiffs also are (or were) shareholders in the Meramec Portland Cement and Material Company, a corporation, which was adjudicated a bankrupt in 1935; in the Central Building and Materials Company, a corporation; and in the Crescent Planing Mill Company, a corporation. Defendants are (Doctor) Bernard F. Striegel, a physician, and his wife, Regina C. Striegel. Defendant Regina is the sister of plaintiffs George and Al.

## Clayton Road Property

As stated, plaintiffs borrowed $10,000 from defendants September 25, 1931. It is apparent plaintiffs borrowed this money to consolidate plaintiff Company and the Meramec Portland Cement and Material Company so as to relieve the straitened financial condition of both corporations. Plaintiffs borrowed of defendants further

sums in 1931 and 1932 so that plaintiffs' total indebtedness to defendants prior to July 5, 1932 was $18,500. On that date defendants advanced plaintiffs the further sum of $15,000.

In 1931 plaintiffs (particularly plaintiff Company, in whom title to the Clayton Road property was vested) had executed a deed of trust on a major portion of the Clayton Road property securing notes for $50,000. These notes and the instrument securing them had been prepared by plaintiffs with the purpose of borrowing money to improve their properties. Plaintiffs delivered these notes and deed of trust to defendants to use as collateral for a loan of $15,000 from the Northwestern Trust Company. The loan was made to defendant Doctor Striegel, and the money was then loaned by the Doctor to Company, the Doctor receiving Company's note of July 5, 1932. Another deed of trust was executed by plaintiffs as further security for the Doctor's account. This deed of trust was on another portion of the Clayton Road property and secured notes aggregating $7,200. Defendants also loaned plaintiffs the further sum of $350 in 1933—this made the total of plaintiffs' indebtedness to defendants the sum of $33,850 in that year.

Subsequently, in late 1935 or early in 1936, Doctor Striegel was advised by a friend, an attorney, John Clancy, that plaintiffs were heavily involved financially and that he (the Doctor) should have "that stuff"—the Clayton Road property—in his name. The Doctor consulted another attorney, Bernard J. Huger, who is a nephew of defendant Regina and of plaintiffs George and Al. A general warranty deed (involved herein) was prepared by Attorney Huger and executed and delivered by plaintiff Company conveying the Clayton Road property to defendants as grantees January 15, 1936. The deed recited a consideration of "one hundred dollars, and other consideration", and was filed for record January 16, 1936. On or about the same date plaintiffs executed a deed of trust on realty (Bellefontaine farm), se-

curing a note for $10,000. However, this note and deed of trust were subsequently given back to plaintiffs in order that they would be free to plat, improve and sell the Bellefontaine land. In 1936 the Clayton Road property was subject to liens for taxes in total amount of $13,905.55. The taxes were paid by Doctor Striegel.

Plaintiff George testified of the circumstances of the execution of the deed of January 15th, as follows,

"Well, Doctor Striegel, as I have already stated, came up and told us that his friend and neighbor, John Clancy, an attorney, said that he (the Doctor) was in a bad fix financially and from the standpoint of security, and he ought to get that stuff in his name, and do it now. The Doctor came and told us that story, and we gave him the deed * * *. That is all he said. He said he wanted that stuff in his name, and we gave him the deed to that. * * * It was shortly before the 15th of January. * * * There wasn't anybody present. The Doctor just delivered the message to me that he got from Clancy with reference to it. * * * My nephew (Huger) came up to my house, and he had the deed with him, and I signed it, and he took it away."

Plaintiff George delivered the deed to Huger for Dr. Striegel. Nothing was said about their account, and no notes or deeds of trust were returned. No statement was rendered plaintiffs.

The witness, plaintiff George, being examined by plaintiffs' counsel, was explaining that he had given the deed for the purpose of securing plaintiffs' account with defendants. But the answer was stricken on motion. Again plaintiff George testified, "Well, he (Doctor Striegel) asked for it, and we gave it to secure our account." This answer was also stricken. And again the trial court overruled an objection to the answer, "I told him * * * that was to secure his account." (Doctor Striegel, testifying as a witness, categorically denied that plaintiff George had made this statement.)

Defendant Doctor Striegel testified as follows,

"Well, I got worried, and was informed that the Ratermanns was in a bad state of affairs; * * * so I went over to Ratermann's house, and told George what Clancy told me. * * * I told him Clancy told me I had better get that in my own name, either by foreclosure or something, so I would be all right. And I told George also, I said we were not satisfied with that Clayton property for the amount of money that I have invested. And so he told me, 'Oh, got to take a little longer.' And he said he would give me a second deed on the Bellefontaine Road (for $10,000). * * * And then I left and went to see my lawyer,

* * * my nephew, Mr. Huger. And I told him that I wanted this piece of property in my name. And he said he * * * would take care of it for me."

After that he got the deed—the warranty to the Clayton Road property—and a second deed of trust on Bellefontaine farm. Later he consented to give the second deed of trust back to plaintiffs so they could get money and "build some houses or do something on the Bellefontaine farm."

Defendants both testified that in 1936 or 1937 defendant George had thought he had a buyer for the Clayton Road property and said he would like to have a deed. The Doctor told George, "Nothing doing. That is mine." (Plaintiff George denied that he ever had such a conversation with the Doctor.) Defendants testified that this was the only time plaintiffs had indicated any claim of interest in the property until after the 99-year lease to Mandel in 1950. Attorney Huger also testified that he did not recall that plaintiffs had claimed any interest in the property until after the Mandel lease was executed. (The lease is for a term of 99 years from October 1, 1950, at a rental of $14,500 per annum for the first ten years; $12,000 per annum for the next 86½ years and $2,000 per annum for the last 2½ years.)

*Montgomery-Parnell and St. Louis Avenue Properties*

These properties were conveyed by plaintiff Company to defendants through one John R. Williams October 7, 1935. The conveyances to Williams and from Williams to defendants were general warranty deeds; each recited a consideration of "One hundred and no/100 Dollars." The conveyances to defendants were recorded January 18, 1936.

Plaintiff George testified that Dr. Striegel was "everlastingly complaining about not having security for his loans, so we deeded the two properties to him, the Clayton Road and the Montgomery Street property (and the St. Louis Avenue property), and we had no consideration * * *." The plaintiffs collected rents on the Montgomery-Parnell and St. Louis Avenue properties until in 1942. Doctor Striegel has paid the taxes. In 1942, Attorney Huger told plaintiff Al that legal action would be taken if plaintiffs continued to collect the rents.

Defendants introduced into evidence a receipt (defendants' Exhibit "8") dated October 15, 1935, signed by defendant Al as secretary of defendant Company as follows,

"Received of Dr. B. F. Striegel the sum of Twenty One Hundred Dollars $2,100.00 Being for part payment on account for property sold to him at 2241 St. Louis Avenue."

Doctor Striegel testified "I got it (Montgomery-Parnell and St. Louis Avenue properties) around '35. A good many years before this, first I went to George and told them that they had other money of mine; that I wanted some paid off; and I wanted pay for it; and, of course, the only thing he had to give me was the Montgomery-Parnell and the St. Louis property." Doctor Striegel further testified that his wife had asked him to let plaintiffs collect the

rent, "it would help them out a whole lot", but it also was arranged that plaintiffs were to pay the taxes. In 1941 Doctor Striegel redeemed the two properties (which had been sold for delinquent taxes for the years 1931 to 1941) in a compromise settlement whereby he paid $2,861.11. It was then, according to the Doctor's testimony, that, inasmuch as plaintiffs had not paid the taxes as they had agreed, he caused Huger to notify plaintiffs that they were no longer to collect rents.

### Spring Avenue (or North and South Road) Property

In early 1936 plaintiffs were indebted to the Northwestern Trust Company, the debts being evidenced by four notes; first, a note of Company for $10,346 secured by the pledge of 100 shares of Crescent Planing Mill Company and an unsecured note of Meramec Portland Cement and Material Company for $161,429.11; second, a note of Company for $100,000 which had been reduced by payments thereon to $18,885; third, a note of plaintiff George for $100,000 reduced to $93,972.50; fourth, a note of plaintiff Al for $100,000 reduced to $74,371. The bank was willing to sell these notes and collateral including certain personalty, and the Spring Avenue property (which the bank had acquired by sale under a deed of trust given to secure its loans to plaintiffs) for $30,750.

Doctor Striegel testified, "Well, my wife told me that they (George and Al) wanted me to take up this collateral that they had at the bank; first, * * * if I took it up they could go to work and do contracting work without being molested with a garnishee, or something like that; and, second, my wife said she didn't want the Ratermann name to be disgraced by going bankrupt." When he arrived at the bank, "Well, there was Mr. Ratermann and Al; and Al brought Gilmore (an attorney) along; but I had never met Gilmore; but in amongst this collateral was a note of one hundred sixty-one thousand that Company had against the Meramec Portland Cement Company, and Al was anxious for Gilmore to get ahold of this note if I bought that because he claimed that he was George's lawyer, * * * and doing some business, and he knew all about it. So we sat down at the bank, and I bought this stuff from the Northwestern Bank." He paid the bank $30,750. He received a bill of sale, and a deed to the Spring Avenue property. Plaintiffs gave him no note. There was nothing said about the purchase being for the benefit of plaintiffs. He has paid the taxes on the Spring Avenue property. He has kept up the repairs. A garage on the property was damaged by fire. He collected the insurance. He engaged plaintiff Al to rebuild the building, and paid Al for the work. Plaintiff Al collected the rents for a time, but, when the Doctor discovered this, he designated another as agent who thereafter made the collection for defendants.

Attorney Gilmore testified that the purchase of the Ratermann notes and collateral was for the benefit of plaintiffs. He said the Doctor was to get six percent on his money. The Doctor had sustained a loss of $3,900 (or more) in disposing of securities to raise the money ($30,750) for the purchase. Plaintiffs' Exhibit "A", in the form of a letter dated January 15, 1936, signed by plaintiffs and addressed to Doctor Striegel, recited the circumstance of the loss sustained by the Doctor on the occasion of his selling the securities and continues, "We know too that the loss was necessitated because of the need of raising money to protect our property interests. It should rightfully, therefore, be our loss and not yours. We regret exceedingly that you should have to bear this burden even temporarily. This letter will authorize you upon the final settlement and payment of our indebtedness to you to deduct that sum from whatever credits we have in the accounting."

Attorney Gilmore testified Exhibit "A" was prepared by him at the Doctor's request and was delivered by him to the Doctor personally. The Doctor and defendant Regina denied that they or either of them had known of the letter until a copy was

exhibited to them after the execution of the lease to Mandel in 1950. The Doctor had agreed to pay attorney fees out of monies to be received upon the liquidation of the collateral. In a letter from Gilmore to the Doctor, dated July 22, 1936, it was written that a statement was enclosed "for services rendered during the past few months in connection with your purchase of the various Ratermann notes from the Northwestern Trust Company."

In their original petition filed September 29, 1950 plaintiffs had raised issues only as to the Clayton Road property and the Mandel lease. Defendant Regina testified that, after the original petition was filed, plaintiff George came to her and proposed that defendants join with plaintiffs "and overthrow the Mandel lease." Plaintiff George "spoke about the different properties. * * * Well, he said, 'We will change this (plaintiffs' petition) to take in a lot of other things.' He said he would like to have me make up my mind, because he didn't have much time to put in this amendment, * * * and that he would like to have me make up my mind to go along with him before he did that." Plaintiffs' (first) amended petition was thereafter filed August 9, 1951 stating a claim raising the issues to include the various other properties hereinbefore mentioned and substantially as stated in the second amended petition.

Plaintiffs-appellants in their brief concede that defendants had advanced to plaintiffs or paid out in purchase money for the Ratermann notes and collateral amounts totaling more than $80,000. This does not include amounts paid out for taxes. Opinions of experts differed as to the value of the properties in 1935 and 1936. Opinions of the value of the Clayton Road property varied between $68,000 and $250,000; of the Montgomery-Parnell property between $5,000 and $7,000; of the Spring Avenue property between $8,500 and $40,000; and one witness was of the opinion the St. Louis Avenue property was worth $4,000. Experts generally agreed that it was difficult in 1935 and 1936 to "move" property. As a witness said, "Your market was somewhat depressed at the time." Defendant Doctor Striegel realized $6,000 on the sale of the Crescent Planing Mill Company stock; $8,000 as a dividend declared on his claim against the bankrupt Meramec Portland Cement and Material Company; and $3,700 on the sale of certain personalty (collateral).

■ As stated, plaintiffs-appellants contend the trial court erred in striking out and excluding the testimony of plaintiff George that the deed to the Clayton Road property was given by plaintiffs "to secure our account." The contention is that the trial court's ruling thus erroneously excluded the testimony of the state of mind, purpose or intention of the witness in executing the deed. See generally Vol. VII, Wigmore on Evidence, 3d Ed., § 1965, p. 104. However, it would seem the issue here is not so much the mere state of mind or secret intention of one or the other of the parties, plaintiffs or defendants, but it would seem the issue is the intention *of the parties,* such as would be manifested by their disclosed intention by express communication, the one to the other, or by their acts and conduct in the circumstances. Holmes v. Fresh, 9 Mo. 201; Carson v. Lee, 281 Mo. 166, 219 S.W. 629. So it is, even if we were to assume the trial court erred in striking out and excluding the answer of the witness, we should say the ruling could not have been prejudicial, because plaintiff George in answer to a further question testified he told Doctor Striegel the Clayton Road deed "was to secure his account." Thus was an inclusive answer admitted into evidence whereby the witness not only in effect expressed plaintiffs' purpose, state of mind or intention but also its communication to Doctor Striegel. The contention is ruled adversely to plaintiffs-appellants.

■ Having examined the evidence, we have noted the debts of plaintiffs to defendants, the relations of the parties, and the

circumstances of the execution of the absolute conveyances in issue. At the outset we observe there were obligations essential to the existence of a mortgage, Mosley v. Cavanagh, supra; and we have noted that these obligations were incurred during a period of economic depression, and that the properties involved were of value probably in excess (although not grossly so if the testimony of the experts, witnesses for defendants, be accepted) of the amount of the obligations which were owed by plaintiffs to defendants at the times the various absolute conveyances were executed and delivered, even in the depressed realty market of the time. We have also noticed the embarrassed financial condition of plaintiffs. There was also evidence introduced tending to show that the notes, evidences of the pre-existing indebtedness, were not given up or surrendered by defendants to plaintiffs. Phillips v. Jackson, 240 Mo. 310, 144 S.W. 112. These circumstances we have considered in determining the parties' intention. And, if the instruments as their inception were intended by the parties to be only security for debt, they could not later be upheld as having the legal character of deeds. Wright v. Brown, supra; Snow v. Funck, supra.

On the other hand, there was no evidence tending to show that defendants had made any demand or had undertaken to collect the notes since the execution of the various absolute conveyances, nor was there evidence plaintiffs had paid interest or any monies on account of the notes or requested any statement of the amount of their indebtedness or had undertaken to redeem the properties. So far as the record discloses, the conduct of the parties, plaintiffs and defendants, has been such as would support the conclusion that the pre-existing debts had been wiped out or merged and no longer existed as legal obligations. Documentary evidence—letters, closing statements and other memoranda—was devoid of any suggestion of an understanding, agreement or intention that the conveyances were to be other than what they purport to be—warranty deeds (save and except the Exhibit "A" introduced by plaintiffs). Since the instruments were executed, defendants have taken over the properties and used them as their own to the exclusion of plaintiffs. Compare Pahler v. Young, supra. Defendants have paid taxes on the properties. After the termination of the explained arrangement for the collection of rentals by plaintiffs, defendants have collected the rents, executed leases as leasors by or through their agent and attorney. They have insured the properties, and collected the insurance on a building damaged by fire. They employed one of the plaintiffs to rebuild the damaged building, and paid him for his services.

■ The Attorney Gilmore testified in effect that the purchase of the Ratermann notes and collateral was for the benefits of plaintiffs; that the amount of the purchase price, $30,750, was to be the obligation of plaintiffs to defendants; that the proceeds of the liquidation of the collateral were to be applied first to the satisfaction of the $30,750, considered as plaintiffs' indebtedness to defendants; and that the balance of the proceeds of the liquidation was then to be applied to other indebtedness of plaintiffs to defendants. He also testified that the Exhibit "A" was prepared at Doctor Striegel's request, and was delivered by him to Doctor Striegel. This testimony was in direct conflict with the testimony of defendants. Likewise, the testimony of plaintiff George (that he told the Doctor at the time the deed to the Clayton Road property was executed that it "was to secure his account") was flatly contradicted by Doctor Striegel. In judging the credibility and probative value of this conflicting testimony we defer to the trial chancellor who heard the witnesses and observed their demeanor when they were on the witness stand.

Plaintiffs did not raise any issue relating to the properties, other than the Clayton Road property, in their original petition. The original petition was not filed until

312

after plaintiffs learned of the Mandel lease executed in 1950. Thus from the time the Clayton Road conveyance was executed in early 1936 until the original petition was filed in September, 1950, plaintiffs manifested no claim of interest in the property. It would be reasonable to infer the inclusion of the other properties in plaintiffs' first and second amended petitions was occasioned only by defendants' refusal to treat with plaintiffs to the end of the "overthrow" of the Mandel lease. It would also be reasonable to draw the conclusion that the execution of the Mandel lease inspired plaintiffs' delayed claim of interest in the Clayton Road property.

Plaintiffs-appellants have said the instant transcript discloses only so much of the conduct of the parties as would indicate "there are essential facts, unfound and yet unpresented to the Court which would make its decision a diamond of justice rather than a zircon of everlasting doubt." This further emphasizes the unexplained delay of approximately fourteen years in the assertion of plaintiffs' claim—such a delay as would make it most difficult to discover and marshal evidence so that a court could ascertain the truth and render certain justice to the parties litigant. Only good faith and reasonable diligence command the action of a court of conscience.

Having reviewed this case, and having deferred to the trial chancellor's rulings, in those instances wherein such deference is due, we are of the opinion plaintiffs have failed to prove their claim by clear, cogent and convincing evidence.

The judgment should be affirmed.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the Court.

All of the Judges concur.