Alfred A. NIEDERHELMAN, Oscar Niederhelman, and Esther Sundemeyer (Original Plaintiffs), and C. F. Sundemeyer and Cora Evelyn Link, As Heirs at Law, and C. F. Sundemeyer, As Administrator of the Estate of Esther Sundemeyer, Deceased, Plaintiffs-Appellants,

v.

Herbert NIEDERHELMAN and John M. Cave, Administrator of the Estate of Frieda Niederhelman, Deceased, Defendants-Respondents.

No. 47642.

Supreme Court of Missouri,

Division No. 1.

June 13, 1960.

Keyes, Bushman & Hearne by Russell T. Keyes, and John L. Hearne, Jefferson City, for plaintiffs-appellants.

Baker & Baker, J. R. Baker and F. P. Baker, Fulton, Bond & Dominique, John O. Bond and P. Pierre Dominique, Jefferson City, for defendants-respondents.

WESTHUES, Presiding Judge.

This lawsuit concerns four tracts of land situated in Sections 18, 19, 30, and Surveys No. 2635 and No. 2636, Township 44, Range 10 West in Callaway County, Missouri. The land is located a few miles east of the Missouri State Highway Bridge at Jefferson City, Missouri, and north of the Missouri River. In the petition, the number of acres involved was stated to be about 290 and accretions thereto. We shall refer to the tracts as One, Two, Three, and Four.

The original petition in this case named Alfred A. Niederhelman, Oscar Niederhelman, and Esther Sundemeyer as plaintiffs and Herbert Niederhelman and Frieda Niederhelman as defendants. The plaintiffs and defendant Herbert are the children of the defendant Frieda. The father,

August Niederhelman, died in 1912 without a will. While the suit was pending, the mother died and John M. Cave, an attorney living at Fulton, Missouri, as the administrator of Frieda's estate was substituted as a defendant. Esther Sundemeyer also died during the pendency of the suit and her daughter, Cora Evelyn Link, and C. F. Sundemeyer, Esther's husband who was the administrator of Esther's estate, were substituted as plaintiffs.

After the first petition was filed, Frieda conveyed to her son Herbert tracts 3 and 4. The plaintiffs filed a second amended petition. In this petition, the plaintiffs asked that the deeds conveying tracts 3 and 4 to Herbert be set aside. In substance, the other relief sought was a partition of all four tracts on the theory that each child was entitled to a ¼ interest in all of the tracts. Plaintiffs also asked for an accounting, claiming that the mother and son Herbert should account to plaintiffs for the rents and profits on all the land beginning with the year 1912 when the father died. In the answers filed by Herbert and by the administrator of Frieda's estate, it was alleged that the mother held tracts No. 1 and No. 2 adversely from the day of her husband's death and that she was the owner in fee; that tracts No. 3 and No. 4 were purchased by Frieda after her husband's death and title was taken in her name; that she was entitled to the rents from all of the land; that she paid off a mortgage on tracts 1 and 2, paid taxes and paid for extensive improvements in the building of barns and other out buildings. In both answers, it was alleged that plaintiffs were not entitled to an accounting; that the mother managed the farms and for most of the years Herbert rented much of the land for which he paid rent to his mother.

It was admitted that no orders were made by the Probate Court in the administration of August Niederhelman's estate concerning the dower or other interest Mrs. Niederhelman had in the lands in question.

The suit was filed in Callaway County, Missouri. By agreement of the parties, the venue was changed to Cole County, Missouri, where the case was tried by the court without a jury. That court by a decree held that title to tracts No. 1 and No. 2 was vested in the children as heirs and ordered partition of these two tracts. The court denied plaintiffs' prayer for an accounting, refused to set aside the deeds whereby the mother, Frieda conveyed tracts No. 3 and No. 4 to Herbert, and decreed that title to these two tracts was vested in Herbert. Plaintiffs appealed from the judgment entered.

In considering the facts shown by the evidence, we should keep in mind plaintiffs' main theory upon which they base their claims. Plaintiffs take the position that the mother's continuous possession of tracts 1 and 2, after her husband's death, and her collection of the rents and profits, constituted her a guardian de son tort of her four minor children; further that tracts 3 and 4 were purchased with money derived from tracts 1 and 2 and therefore the mother held these tracts in trust for her children.

As to defendant Herbert, plaintiffs claim that a close confidential relationship existed between the mother and Herbert and that he obtained title to tracts 3 and 4 by fraud and for an inadequate consideration.

We shall relate the history of the August Niederhelman family as shown by the record in so far as it is material to the issues in this case. It is our opinion that a statement of the facts will demonstrate that the trial court's decree was for the right parties.

In 1912, August Niederhelman owned and farmed tracts 1 and 2 consisting of about 140 acres. An 80-acre tract (No. 1) was the home place. Tract No. 2 was not far distant and treated as a part of the farm. In 1912, August was accidently killed, leaving his wife Frieda, then about 40 years old, Herbert and Oscar, twins, age 11, Alfred, age 3, and Esther, age 13. Al-

fred, the youngest child, became of age about 1930. The evidence does not show that August had any personal property except farm implements and the usual livestock connected with such farm operations. A debt of $2,500 was on the land. There was some indefinite reference made to insurance. The mother rented the land to various persons for about three years. Then the twins, Herbert and Oscar, began farming the land. The mother took all of the rent until the twins became of age. In 1913, before the estate of August was closed, the mother purchased tract No. 3 which was an island of low river land of about 24 acres. This was purchased from Callaway County, Missouri, for $50. Title was taken in the name of the mother, Mrs. Frieda Niederhelman. About the time that the twins became of age, tract No. 4 was purchased. This was referred to as the Bailey farm consisting of 131 acres. The price paid was $24,500. At the time of purchase, $9,500 was paid. To make up this sum, the mother borrowed $1,500 from each of the twins and $6,500 was furnished by the mother. From what source the $6,500 came was not definitely established. Three notes of $5,000 each were executed and delivered to the Baileys for the balance of the purchase price. Esther Niederhelman was married and left home before the Bailey farm was purchased. Alfred was going to school at that time and continued to attend various schools. He studied for the ministry and obtained a good education including seven years of college after graduating from high school.

In 1954, when this suit was filed, Alfred was pastor of the Plymouth Congregational Church at Fond du Lac, Wisconsin. Beginning with the year 1922, Herbert and Oscar lived with their mother and tilled most of the land on a 50-50 rental basis. The mother paid all of the taxes including drainage taxes and assessments. These assessments amounted to sums of $2,700 one year and $800 for another year. The mother, after the death of her husband, also paid for the construction of a barn and other out buildings and some major repairs on the home. She also paid in full the debt of $2,500 that was against the farm at the time of her husband's death.

The mother, so all parties agreed, managed the farms without interference on the part of her children. She kept a record of the share of Herbert and that of Oscar by giving them notes for the amounts due them as renters. Now and then, when crops were sold, the share of the twins would be determined and the old notes would be destroyed and new notes with the total sum due would be signed by the mother and delivered to Herbert and Oscar. The mother would use the cash to pay living expenses, insurance, interest on outstanding notes, and all other bills that were incurred. This arrangement with Herbert and Oscar continued until about 1933 when Oscar was married and left home. At that time, Herbert and Oscar each held a note signed by the mother for $5,000. After Oscar left home, Herbert operated the farms on a rental basis in the same manner as had been done before Oscar left except that Oscar no longer shared in the fruits of the farm operation. About 1942, Oscar, who had been receiving interest on his note of $5,000, was called by his mother and she paid him the $5,000 due on the note. Oscar made some objection to this, saying that he considered he had in interest in the land. While the evidence is not certain on this point, the inference may be drawn from the evidence that the mother had heard that Oscar was claiming an interest in the land and for that reason she wanted to pay the note in full. She borrowed the $5,000 from Herbert so she could pay Oscar. The evidence justifies the conclusion that the mother considered herself the owner in fee of all the land.

The mother was having some difficulty in making all the payments for various items such as taxes, interest, amounts due on notes, improvements, and levy taxes. Oscar testified that it had been necessary for him, before his marriage, to let his mother have money to pay bills or she

would have lost the land. Alfred testified that while he was attending school, during the 1930's, his mother would send him money now and then to help him obtain an education. Note his evidence:

"A. * * * I was in college, in '30, '31, '32, during which time there was no money available, or very little. Wheat was selling and corn was selling at a very cheap price, 25 or 30 cents a bushel or something of that sort. There was no money to be had. The result was that during those years I very largely provided my own expenses. I did not attend one of the most expensive schools in the country. Many evenings I washed dishes, waited on tables in a restaurant in Chicago, scrubbed floors, did all sorts of jobs in order to earn money with which to go to school. Now, whenever Mother would have $25 or whatever amount she might have, which wasn't too often during those years, she would let me have it."

It was also in evidence that during the time Oscar was at home renting on shares from 1922 to 1933, financial conditions were not too good. A portion of his evidence follows:

"A. Well, we kept accounts, she bought that farm there, we got of age, of course, after we got of age we rented the farms and it was along about that time she bought it and things got pretty bad for a while there and it wasn't nothing for us to do but let her use our funds, see. Well, truthfully about it, if it hadn't been for that she would have lost the farm."

In the late 1930's, Herbert began to buy and sell hogs and cattle. He used tract No. 3, when in condition, to pasture some of the stock. He later purchased a hill farm which was used exclusively to pasture stock. Because of the war in progress during many of the years while Herbert engaged in this business, the livestock market was very good and Herbert made large profits. Herbert made loans to his mother to pay Oscar's note of $5,000 and also to pay the major portions of the notes due to the Baileys for the purchase of tract No. 4.

Herbert continued in dealing in livestock until about 1950. Frieda, the mother, became ill in 1949 and needed someone to care for her. In 1950, her condition became worse and a woman was employed to care for her. This did not seem satisfactory. The mother often complained about the treatment she received and was very dissatisfied. It was then that the mother asked Herbert to give up his dealing in livestock, quit farming, and devote his time to taking care of her. She informed him that he could have all of the rental from the land if he would comply with her request. Herbert disposed of most of his cattle and hogs, stored his farm implements, and quit farming. From that time to the day of his mother's death, he devoted his time to caring for her. The mother died in May, 1955, intestate.

During Mrs. Niederhelman's illness, she was taken to a hospital on a number of occasions and Dr. Leon Taylor, her physician, made frequent calls at the home. The record shows conclusively that Herbert took excellent care of his mother and paid all of the bills. Note Dr. Taylor's evidence with reference to the relationship between Herbert and his mother:

"A. Well, it's one of those kind of things you see a father-son, mother-son, mother-daughter, father-daughter complex where they live together so long they are inseparable. When I would see one I would see the other one. That would be my impression. I don't know how to describe that question. There is a complex between them. If one was there, the other was there. They were inseparable.

"Q. Do you know, in your observation, could you tell what kind of care that Herbert took of his mother during that illness?

"A. Very excellent. She wanted nothing that she didn't get, absolutely nothing.

"Q. Who paid you, Doctor, for your services?

"A. Herbert paid all the bills."

After a disastrous flood in 1951, Herbert and his mother moved to Herbert's hill farm where they remained except for short intervals, when the mother would be in a hospital, until about a week before her death when she was taken to Oscar's home because of repairs being made on Herbert's home. Herbert did not marry until after his mother died.

█ In the early part of 1954, Alfred wrote his mother asking for a loan of $10,000. Herbert answered this letter informing Alfred that his mother did not have the money but that he, Herbert, would lend Alfred the $10,000. The present suit soon followed. After this suit was filed, the mother by deed conveyed to Herbert tracts 3 and 4. We shall first dispose of the reason tract 3 was so conveyed. It will be remembered that in 1913 the mother bought tract 3 from Callaway County for $50. It was an island containing about 24 acres of little value. It was low and subject to frequent overflow. Through floods and changes in the Missouri River, the island was enlarged by accretions and deposits of silt raised the level of the land. A lawsuit filed in 1934 involved a dispute over the boundary line and whether accretions added land to the island. This suit was determined in favor of Mrs. Niederhelman. When the suit was filed, Mrs. Niederhelman told Herbert if he would pay for the expense of the lawsuit, clear the land, and care for it, he could have it. The cost of the lawsuit was in excess of $600 which Herbert paid. From then on Herbert treated the island or tract as his own. This was not an unusual or odd arrangement considering the fact that Herbert was staying home and farming the land. The island was of little value

then. From what source the mother obtained the $50 was not shown. True, plaintiffs testified it came from the fruits of tracts 1 and 2 but that was a mere conclusion of the witnesses. The mother did obtain $900 from her husband's estate. It is our conclusion that the $50 was the personal property of the mother. We can find no theory upon which a court of equity would be justified in setting aside the deed executed in 1954 conveying tract 3 to Herbert. That is all that need be said about tract 3.

The deed conveying tract 4 recited a consideration of $24,500. Herbert testified that he cancelled two notes in exchange for the deed, one for $7,786 and another for $15,659. His testimony was that when the Bailey notes became due his mother did not have the money and he loaned the money to his mother to pay the notes. The evidence showed that a deed conveying tract 4 to Herbert was first drawn in 1952 before this suit was filed. Due to the illness of the mother, the deed was not executed at that time. The evidence is very uncertain as to the source of the $6,500 paid by the mother in 1922 as part of the purchase price on the Bailey farm or tract 4. Mrs. Niederhelman may have saved some money from her husband's estate as his widow and she may have been paid some insurance money. Certain it is that insurance was mentioned after the father died.

█ There was no concealment of the conveyances of tracts 3 and 4 to Herbert. Four witnesses were present when the deeds were executed. An attorney at Fulton marked the notes paid that were given for the deed to tract 4. These conveyances were not made because plaintiffs filed this suit. As stated above, a similar deed to tract 4 was prepared two years before the suit was filed. Furthermore, the evidence shows beyond doubt that Mrs. Niederhelman was a strong and determined woman and could not be easily persuaded. The record shows that the land, that is, tract

4, was worth between $25,000 and $30,000. That in itself does not show that no adequate consideration was given. Herbert did cancel notes of more than $23,000. The mother may have wanted to reward Herbert for his many years of devotion to her. As stated above, Herbert did not marry until after his mother died. He devoted much of his time to care and look after his mother's interest. The record fails to show any fraud or undue influence on the part of Herbert in the execution of the deeds to tracts 3 and 4. Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59; Thomason v. Beery, Mo., 235 S.W.2d 308, loc. cit. 312 (4).

Plaintiffs cited the case of Allison v. Mildred, Mo., 307 S.W.2d 447, among others, in support of their contention that fraud was practiced by Herbert. The facts in that case are so different from those in the case before us that it is not an authority. In fact, that case concerned a conveyance to defraud creditors.

Plaintiffs in this case are faced with two unsurmountable obstacles to obtain equitable relief. Certainly the children of Frieda Niederhelman could have asserted their rights at any time after Alfred became of age. They did not do so but permitted their mother through all the years, from 1912 to 1954, to use the land in question as her own. She carried the burden of supporting the minor children out of the rental from the lands, paid all of the taxes, special levy assessments, the mortgage, and paid for valuable improvement. She did this through prosperous years and lean years, through droughts and floods, through times when farm products were valuable and times when they were worthless. As one of the plaintiffs (Oscar) testified, if he and his brother (Herbert) had not loaned their mother money to pay bills, the farms would have been lost. Another plaintiff, Alfred, testified that his mother had little money to help him at school in the 1930's. "There was no money to be had." Then, after sitting idly by for many, many years, plaintiffs ask for an account-

ing. In the circumstances, such relief should not be granted. Furthermore, plaintiffs' mother, in conjunction with Herbert, preserved tracts 1 and 2 for plaintiffs and Herbert. The land included therein is now free of the indebtedness of $2,500, levy taxes and other taxes were paid, improvements were made and the land is now more valuable than in 1912 when the father died. The doctrine of laches is certainly applicable to the actions of plaintiffs. 30 C.J.S. Equity § 113, pp. 523–526; Ratermann v. Striegel, Mo., 273 S.W.2d 304, loc. cit. 312 (10, 11); Thomason v. Beery, 235 S.W.2d 308, loc. cit. 311 (2).

Another obstacle is that the mother asserted ownership of all of the land, stating that the land belonged to her and when she died, the children could have it. When she heard that Oscar was saying he had an interest in the land, she immediately sent for him and paid the $5,000 note. This occurred about 1942. All through the years, Mrs. Niederhelman held herself out as the owner in fee. Levy assessments were in her name. Suits involving the levy district and tract 3 were also defended in her name. We need not restate other facts related supra. The evidence amply supports the plea of adverse possession. A similar case was decided by this court in 1931. See Moore v. Hoffman, 327 Mo. 852, 39 S.W.2d 339, loc. cit. 343 (11, 12) (13, 14), 75 A.L.R. 135. It was there held that the mother held land by adverse possession which ripened into title. The facts in the case of Moore v. Hoffman, supra, were somewhat similar to those in the case now before us. This court there said, 39 S.W.2d loc. cit. 343 (13, 14): "The law is well settled in this state that adverse possession of land for the required time and of the requisite character not only bars any and every action brought to recover such land or an interest therein, but extinguishes the claimant's title and confers on the party in possession a full title in fee, as much so as a warranty deed from the true owner." See also Hunott v. Critchlow, 365 Mo. 600, 285 S.W.2d 594, loc. cit. 599

(4), and Falvey v. Hicks, 315 Mo. 442, 286 S.W. 385 loc. cit. 395 (22).

The trial court having the opportunity to observe witnesses was in a better position to judge the credibility of the witnesses and to weigh the evidence than this appellate court reading the cold record. However, after a reading of this record, we have reached the same conclusion as did the trial court, that is, the evidence produced does not justify a court of equity in granting any relief. Having disposed of this case on the theories expressed in this opinion, we find it unnecessary to consider other questions briefed.

The judgment of the trial court is hereby affirmed.

All concur.